Good morning. You may proceed. Good morning. May it please the Court, I'm Gail Gaines on behalf of Appellant FutureFuel Chemical Company. We've raised a number of issues on this appeal and I want to try to briefly cover them all in overview and then go back in detail as time and your questions may permit. The first issue I want to address may seem more ancillary or superficial, but it's of paramount importance to my client. And that's the issue with regard to confidential documents. Early on in this case, the parties entered into an agreement whereby they submitted to the court something that confidential documents, trade secrets, competitive documents with regard to their customers would be kept under seal. My client relied upon this in proceeding forward in discovery. Documents were filed under seal and at the conclusion of the case, after the court granted summary judgment, the court unsealed the documents. We understand that there is a common law right to public access, but in this instance that is not an absolute right and it must be weighed against the competing interests. The interest of my client in having its trade secret documents, its pricing documents held in confidence. There's been no outcry for those documents. The only entities we would assert that would even have any interest would be our competitors, our customers and our potential customers. We relied upon that and we feel like there's no basis that the weighing of the interest should protect those remaining under seal at this point in time. The next issue, and that of course is the meat of the case, is the summary judgment. I have a question, if I can, about the documents under seal. As I look at the record, and you can please correct me if I have this wrong, but it's my understanding that the district court told the parties that it would consider objections to its proposed order, but never had the opportunity to do that because the appeal intervened. I read the judge's order as a final order without prejudice. She made her ruling and said you can come back after the fact, if that is still necessary. It would be our position that this court may rule that the judge did make a final ruling, but it was without prejudice that we could come back later. So we would assert, because we're before the court, this is the appropriate body to respond to that issue. Did the district court also indicate that subsequently that it would reconsider the order? Did it reconsider the matter after a mandate was issued by this court? The court, as I understood it, denied our motion without prejudice. And that was if we wanted to affirmatively go forward, we could before the district court. But at this point, the district court has ruled, would be the position that we would take on it, and therefore that it would be right for this court. But as far as a matter of the facts and the record, did the court state that it would reconsider the matter after this appeal was complete, after the fact? After a mandate had been entered? The court gave us 15 days to file another pleading if we wished the court to review the items one by one. But did it make reference to reconsidering the matter after a mandate was issued by this court? That's my understanding, is what Judge Wright said. I understood that we would be given that right, but that the court had made a ruling. I understand your position on it. But if all of that is true, I wonder, why wouldn't the prudent action be for the court to allow Judge Wright an opportunity to review the matter, as she indicated that she would, after the appeal itself was sorted out? I can understand that. Our thought was judicial economy would favor going forward with all issues now. The court has entered a ruling. We're here before this court, and we felt it would be the time to do it now rather than waiting. For the moment, what is the status of those documents? They are under seal. That's what I thought. If I may, the next issue I want to address, and again, in overview form, is the meat of the case. That is that the district court granted summary judgment on a claim of breach of contract and detrimental reliance or promissory estoppel. Each of those issues are findings of fact. The court may only grant summary judgment if there are no genuine issues of material fact. We would submit that there is overwhelming evidence from which the court could find that there was a meeting of the minds as to a contract in a document entitled letter of intent, and that that was for present action as well as for future action. We would further submit that both the documents signed by the parties and their e-mails going back and forth showed the meeting of the minds that they entered into this document with intent that it was important. They submitted it. They went back and forth on the terms, and then through their actions, Lonza knew that Future Fuel would only go forward with giving them this supply of DEM if Lonza would commit to make a purchase. The letter of intent provides that. If I may now briefly. Parties express their intent through their written documents? I mean, my goodness. I shouldn't say my goodness, but what would happen if we agreed with your argument? What would be done when the case went back to the district court? Would these people testify as to what they thought they were doing? It would be a fact question. Yes, Your Honor, these people would testify as to how they entered into the contract, what their motives were when they did it. Lonza didn't back out of this because the contract terms were complete. They backed out of this because their business interests changed. But they knew at the time they entered into this, the parties agreed, at least for 2009, a thousand metric tons would be purchased, and that that was the only reason they would go forward. Future Fuel told them, there are emails back and forth that indicate they knew that unless they gave that volume commitment, Future Fuel wouldn't be able to give them the quantity and quality of DEM they required. Therefore, they entered into the letter of intent, which by its very terms shows that it's a contract. But particularly when one considers the exchanges back and forth, it's a contract. We would assert that the district court in essence used the wrong factual and legal analysis. The district court said the crucial question is whether the parties intended the letter of intent to serve as an agreement to negotiate a future long-term supply contract, or whether they intended the letter of intent as a long-term supply contract that would be memorialized in a formal agreement. It was neither of those. It was a contract they entered into that provided for several things. It provided that Future Fuel would store DEM. It provided that Future Fuel would produce and Lonsdale would purchase a thousand metric tons of DEM in 2009. And it was a contract that the parties would work together to work out the details of how the purchase orders would be done, how the orders would be filled. That wasn't the contract. The contract was that they would purchase that much. In later years, the contract regarded how much they needed. It was not an issue of a specific amount. But for the initial time, it was a specific amount. And Lonsdale knew that. And Lonsdale reported in their emails back and forth. Lonsdale specifically stated their man in charge of this at page 841, the LOI turns the whole responsibility to Lonsdale. At page 853, we have a contract with Future Fuel that we were far from fulfilling. Page 844, we promised a far too large quantity to Future Fuel. Over and over they indicate, 700, your proposal that we agreed to in the letter of intent. Lonsdale made clear before, during, and after that they knew this was a requirement upon them. This shows a contract and it shows a meeting of the minds. And it's a question of fact for the court, it's a question of fact for the fact finder to decide. Lonsdale cites some cases with regard to letters of intent in other jurisdictions and contends they might be persuasive to this. I would say that those other letters of intent include what I would call an escape clause. They say, you will purchase this, you will do this, unless something else happens. This didn't include any escape clause. There was no way out of this. This was an affirmative statement that they would purchase this amount. It's something that the parties knew was important because they went back and forth on it. We would contend that that makes this a contract. This is a writing on which the parties had a mutual meeting of the minds and that the circumstances before, during, and after demonstrate that. Was your client ready and able to perform? Absolutely. My client was ready, able to perform. They did not perform because Lonsdale already breached and they were not required to make the thousand metric tons and send them to Lonsdale. Yes, they were perfectly ready. And moments before Lonsdale told Future Fuel they weren't going to go forward with it, Lonsdale was at the Future Fuel facility doing an audit to make sure that Future Fuel could make this supply. Lonsdale was watching all along as Future Fuel spent $1.5 million reconfiguring something else in its plan to make DEM for Lonsdale. Did Future Fuel ever make demand on Lonsdale to take or to accept the 1,000 metric tons for 2009? Yes. They did that through e-mails. Was Future Fuel, did Future Fuel produce enough of this substance to satisfy that what you say was an obligation to sell Lonsdale 1,000 metric tons of this substance? They could have produced it, but they didn't produce it because they weren't going to be paid for it. It was a matter of they would have to expend all their time and money for something that they could see wasn't going to go forward because Lonsdale declined to be bound by the contract that they entered into. They declined to make the purchase that they promised and contracted for. The answer to that question is no. It didn't produce enough of the substance to satisfy the 1,000 metric ton requirement for 2009. Now, I know you've got an explanation for that, but I just want to clarify the answer is no. The answer is no, and the answer is no because Lonsdale had already breached, and therefore its obligation to go forward and produce that was excused by Lonsdale's breach. That would be our position with regard to that. In the event that the fact finder finds that a contract was not created, we also sued on the theory of detrimental reliance or promissory estoppel. That is an issue where a promise was made, the promissor, Lonsdale, knew that Future Fuel was relying on that promise, that it didn't go through with it, and that justice can only be served by requiring them to do so. Again, this is a fact question. Lonsdale cites a case that says this is a question of law for the court and cites an Eighth Circuit case. This is an Arkansas law case, and Arkansas court cases are replete in indicating that whether a promissory estoppel claim is established is a question of fact. Again, the parties, Lonsdale knew, Lonsdale needed DEM. It lost its supplier of DEM, and it had to get some DEM. It knew it needed it, and there are only two or three or four companies in the world that could produce this. They were negotiating secretly with Future Fuel and another. The other company fell through. Throughout the e-mails, Future Fuel told Lonsdale, we must have a commitment from you before we can go forward with this. Lonsdale's own internal e-mails indicate they knew that Future Fuel required a commitment and that they had a couple of choices, and if they wanted Future Fuel to be the one to produce it, they had to make a commitment to them. And if I may just touch again on the other issue, that is the jury trial issue. I acknowledge I made a mistake on behalf of Future Fuel and didn't timely request a jury trial. One of the factors that the court may consider is the reason for the delay, and the delay was my neglect. But the Eighth Circuit has not heretofore adopted a rule that neglect alone can be a factor that will lead to a jury trial that my client is denied if the court doesn't find that the district court abused its discretion. The district court acknowledged this is the kind of case where jury trials are used. The court acknowledged that it could rearrange its schedule and that it wouldn't be a hardship. The court found that Lonsdale would be prejudiced if we went forward with a jury trial. The request was made three months before the trial date. One of the cases on which Lonsdale relies, the jury trial request was made just a matter of days before the trial was to go forward. In this instance, the court could have if further discovery needed to be done, it could have been done. Lonsdale didn't establish how or why it lost anything. It just said its tactics would have been different. There's nothing that couldn't have been fixed, particularly when we were three months out from a trial date. No expert discovery had taken place. No motions had been filed. Moreover, there's an 8th Circuit case that indicates that once a case has been tried, is appealed and goes back down again, any waiver of a jury trial right is excused and the parties are able to start over. We would contend, particularly since we've got this appeal now, that if we go back down again, there's 8th Circuit precedent that says any prior waiver is no longer a waiver. We would submit that this court has the opportunity and obligation to make that ruling on its remand of the summary judgment. The final issue that we've raised on our appeal has to do with attorney's fees, and that is if we don't prevail on the summary judgment issue, the attorney's fees that were awarded by the court, we contend, are not appropriate in this case. They're only appropriate when permitted by statute. Arkansas law permits attorney's fees when a case is primarily sounding in contract. This case didn't primarily sound in contract. Contract was a substantial issue, but the cases say that's not enough. So we would contend there's no appropriate award of attorney's fees. If the fees are awarded, we would say that the fees should at the very least be taken half. I thought you were contending this is a breach of contract. It is both. We contend, first and foremost, it's a breach of contract. We recognize that we may not chin the bar on that. Therefore, we have a contention that it's a promissory estoppel or detrimental reliance. Either of these can be found by the trier of fact. Had we had a trial and we would have had a ruling on one or the other, then we would have known. In this instance, Lonza's time was spent defending both of those claims. Their billing entries don't show how they were defending one or the other. At the very most, we would say they would get a portion of their fees. But we would contend that in this instance, this case is both. It proceeded on both theories. And for that reason, they're not entitled to attorney's fees because it didn't primarily sound in contract. Do you have a case that stands for the proposition that where a party asserts a breach of contract as its initial contention, that it remains not primarily a contract action? It seems to me your client has to make a decision as to what it contends this is. You can't have it both ways. It's whatever we're able to prove it is. And we recognize that we may not be able to prove it's a contract. It's either of those. It's whichever we can approve. And yes, we have cases that say just because a contract is a substantial part, it's not the primary part. I don't have a case where the two issues are detrimental reliance and contract and it's a summary judgment and the court decides at that point. Your Honor, if I may reserve my remaining time for rebuttal. You may do so, Your Honor. Thank you. Good morning. You may proceed. Good morning. Thank you, Your Honors. My name is Ginny Nolson Dockery and I am counsel for the Appellee Lonza, Inc. We ask today that this court affirm the district court's order granting summary judgment in favor of Lonza as to all of the counts in this action and that the court further affirm the district court's award of Lonza's attorney's fees incurred in the defense. Turning first to the order granting summary judgment, we believe this court's determination, as was the trial court's, can be guided by the application of pure legal principles under Arkansas law because there is simply no evidence in the record supporting the existence of a district attorney's fee for Lonza to purchase 1,000 metric tons of DEM in 2009. As your colleague or your opponent pointed out, there are some provisions that seem fairly specific to me. Lonza agrees to, well, I shouldn't quote them all, but how doesn't, why doesn't that statement arguably constitute a binding, an enforceable promise? What more would be necessary to keep the Lonza, in effect hold the Lonza, the Lonzas of the world to their promise? Well, your Honor, I think that as the court requires, we have to look at what the party's intent was as expressed in the letter of intent. And as the letter of intent announces in just the first section, the parties had yet to negotiate, develop, and execute the definitive supply agreement under which they would be bound. And in fact, Future Fuel concedes, your Honors, and I believe this is critical, they concede in their brief at page 19 that the letter of intent did not obligate Lonza to purchase any DEM whatsoever in 2010 or 2011. In fact, they concede that the letter of intent was merely a contract to negotiate in good faith toward a definitive supply agreement under which the party's intent, nor any of the evidence in the record, distinguishes 2009 from what Future Fuel concedes was not a binding contract or a binding promise for 2010 and 2011. And the reason for that is two, is two, for twofold. The letter of intent on its face announces that it was exactly what Future Fuel described in its proposal to Lonza. It was merely an outline for the basis of a future business agreement. And the letter of intent was only to describe in broad terms that future agreement. Those were Future Fuel's words in its proposal. And the letter of intent that the parties then signed a mere four weeks later expresses and announces in three separate places in just the purpose section alone, that the parties intended that they would move forward and negotiate the contract pursuant to which they would apply their signatures and then be bound. And specifically, Your Honor, the language of the letter of intent does not include any specific language for 2009 that creates, as Future Fuel would like this court to do, to create a freestanding contract out of that letter of intent. The only language that Future Fuel can point to in the letter of intent as creating this short-term contract that they call it is the language under the long-term supply section of the document in which Future Fuel argues using the following language, that Lonza agrees to purchase DEM from Future Fuel at the following volumes, 1,000 metric tons for 2009. And Future Fuel's argument stops there. But that sentence continues. Eighty percent of its worldwide demand for 2010. Eighty percent of its worldwide demand for 2011. There's nothing in the letter of intent that bifurcates 2009 from what it concedes the parties had yet to reserve for their future negotiations. I'm not following you on that last statement. Where was it lacking in terms, specificity? Future Fuel concedes, Your Honor, that the language that is cited in the letter of intent does not create a contract or a promise for 2010 or 2011. And it is the same language in the letter of intent that they would ask this court to create a separate contract from. And in fact, Your Honor, Future Fuel's key negotiator, Dr. Fry, conceded in his deposition that neither Future Fuel nor Lonza ever agreed to this short-term contract. He was asked in his deposition why Future Fuel considered and rejected the notion of seeking a non-cancellable purchase order or some other binding form of commitment from Lonza. What did Lonza agree to do through its letter of intent statement? Exactly what the language of the letter of intent says, Your Honor. Future Fuel and Lonza agreed that they would move forward and negotiate a definitive agreement, and that agreement would contain in broad terms the terms that are identified in the letter of intent. And they did that through six separate supply agreements, each one of which had a term commencing in either December 2008 or January 2009. And every one of those six draft supply agreements addressed volumes for 2009 as well as future years. And critically, each of those drafts had, in terms of volumes, different amounts for Lonza to purchase in 2009. The very first draft that Future Fuel sent to Lonza expressed DEM volumes at 2.2 million pounds. As late as December 15 of 2008, Future Fuel sent a draft to Lonza that did not address 1,000 metric tons for 2009 at all. It merely expressed a three-year term in which each of the years Lonza would purchase 80 percent of its worldwide demand, up to a maximum of 3.5 million pounds. You're talking, I think you said six separate supply agreements. You're talking about six separate drafts. Correct, Your Honor. They negotiated through six separate draft supply agreements that were all intended to move towards the definitive agreement that they would execute. And in fact, Your Honor, as I said, Dr. Frey expressly rejected the notion that the parties had agreed to this one-year short-term contract because he testified that Future Fuel rejected the concept of seeking a non-cancelable purchase order or other form of binding commitment rather than the letter of intent. And he said because a non-cancelable purchase order is a short-term agreement and it would have taken time to work out the details of that. The parties, Your Honor, as the record evidence unquestionably shows, at no point ever believed, and Future Fuel never believed that it had a binding contract from Lonza. Again, what did Lonza commit itself to do? To negotiate, Your Honor, to negotiate in good faith. In its mind, as your opponent said, you backed out because your interests changed. Well, Your Honor, we believe that the record shows. I guess your answer is that's the way the world runs. No, our answer, Your Honor, would be that this is a pattern common to commercial life. Parties reach a concordance to the general terms of their transaction. They memorialize that in a document they entitle a letter of intent that includes an agreement to negotiate and contemplates negotiations and future decision. Something breaks down. The agreement's never finalized, but that does not transform what the parties intended to be merely a preliminary stage for negotiations into a contract. And in fact, the undisputed evidence in the case shows that Future Fuel was repeatedly over the course of the months commencing with September until June of 2009 advising Lonza that it needed to have a contract in place in order to supply DEM. Dr. Frey testified that by February of 2009, he was starting to get nervous because they didn't have a supply agreement in place. Mr. Allgaier, who was the key contact for Future Fuel to Lonza, sent an email to Lonza on April 27th of 2009 saying, I believe it would be in everybody's best interest to have a contract in place. Could you revise the contract to meet your needs and send it back to us? Two days later, he sent another email to Dr. Lugin at Lonza advising, I would like to suggest an option. Could I visit your site and work to complete the contract? On June 3rd of 2009, the record shows that Mr. Allgaier had a telephone conference with Lonza and he reported about that conference to his internal management team. He reported to the team, I told Dr. Lugin that we need to have a contract in place in order to protect Lonza from not having DEM available. Future Fuel directly expressed to Lonza as late as June that it understood that the parties didn't have a contract and that without that contract, Future Fuel would be in the record of the lack of a contract than the fact that in July of 2009, Lonza asked to purchase DEM from Future Fuel and Future Fuel cited and sold Lonza 60 metric tons of DEM at a price higher than what appeared in the letter of intent. And Dr. Fry testified that the reason that Future Fuel cited that price was because the negotiations at that point were fallow and would have had to have been resurrected. There was no cry of breach by Future Fuel because they understood and at every point acted with the clear understanding that all they had in the letter of intent was an agreement to move forward to negotiate a contract. What they did not have was a contract. And in fact, Your Honor, the court would have to supply essential terms in order to find a contract because in this case there was no specificity with respect to price. The letter of intent provides two separate prices for 1,000 metric tons of DEM, both a reference to an initial price of $1.38 as well as a price of $1.41 for 700 to 1,000 metric tons. And critically, the letter of intent expressly reserved the parties' negotiations for a quarterly price adjustment formula that was to become effective as appears on the face of the letter of intent on April 1 of 2009. And the parties, in fact, did negotiate that quarterly price formula in their drafts from September through the winter of 2009. And Dr. Fry concedes that this was a significant term for both parties and that the parties actually reached disagreement as to the quarterly price adjustment formula and that as late as December of 2008, well into the negotiations, Dr. Fry concedes the parties realized the formula they were negotiating did not work and would have to be revised. The letter of intent contains no index for how to determine the quarterly price formula and contains no other terms or ability for a court to supply what that price would be. And the reason for that is because, as the parties expressly stated in the document, the parties would negotiate toward the quarterly price adjustment formula for 2009 and beyond in the definitive agreement. So not only does the document not on its face express agreement by the parties as to all of the material terms, it expressly states that what it was was a commitment to move forward and that the final agreement would bind the parties. I guess that gets us to the promissory estoppel. Future Fuels did make some substantial commitments based upon its reliance on the letter of intent. Your Honor, we believe that Future Fuel took the steps that it took to configure its plant, not because it believed it had a promise by Lonza to purchase 1,000 metric tons in 2009, but because it believed it had the promise that was stated in the letter of intent, a promise to negotiate. And it's inescapable in the record that the parties continued to do just that. But this was not a promise, and Future Fuel can cite to no evidence in the record whereby Lonza specifically promised to purchase 1,000 metric tons in 2009 from Lonza. And in fact, Your Honor, once again, there is no specificity in the record with respect to the price that Lonza would pay for that 1,000 metric tons of DEM. Future Fuel excises from the letter of intent $1.38, but as we've just discussed, that letter of intent is not specific with respect to price. And putting aside the letter of intent, Future Fuel cites to absolutely no citation in the record whereby there is an expression specific to 2009 for Lonza to purchase that amount of DEM. And the reason for that is because Future Fuel knew that it didn't have an enforceable promise by Lonza, because as late as June of 2009, it was still urging Lonza to make that promise by asking it to complete the contract. And so in the absence of this court finding, as affirming that the district court found correctly that there was no contract, we submit that there similarly is no legally enforceable promise upon which Future Fuel could have relied. It's clear in the record that Future Fuel was looking for a commitment, but the commitment that it obtained, as Future Fuel points to, was the letter of intent, which was a commitment and a promise and an agreement to do nothing more than negotiate towards that definitive agreement. In fact, Your Honor, as we look at the record evidence, the parties continued through the fall to negotiate not simply price, but a host of other terms that Future Fuel concedes they had disagreement about. That as late as the fall and early winter of 2009, the parties were still attempting to come to some resolution about that disagreement. Dr. Frey concedes that those were important terms that included things like estimated annual volumes, total maximum volume commitments, indemnification, deliveries, and that by the winter of 2009, Mr. Allgaier and Dr. Frey had an internal discussion where they conceded that the negotiations were actually extending out more and more. Well, to belabor the obvious, but there again, what specific terms were so lacking that we could not find a contract from what the parties had expressed in their letters of intent? Specifically, was it the price or the quantity or both? I believe, Your Honor, that it was with respect to both the price and the quantity. Because the, as we discussed earlier... In other words, because 80% of its worldwide demand is just too vague a proposition or what? Well, Your Honor, we would submit that the record evidence shows that both the letter of intent and the parties' negotiations expressed a host of different volumes that the parties were contemplating. And Dr. Frey testified in his deposition that the discussions went back and forth significantly between the two companies as they discussed the needs that Lanza might have for the volume. We submit that the expression in the letter of intent is simply a signification of the broad terms under which the parties were going to move forward to negotiate that agreement. And as those negotiations borne out, the volumes that the parties discussed changed as Lanza's needs changed. And significantly, to that point in the record, Mr. Allgaier's June 3rd email to Dr. Lugin... Excuse me. April 27th email to Dr. Lugin asked Dr. Lugin, on behalf of Lanza, to update its needs and its demands for DEM, which was a continuation of the parties' negotiations with respect to what the volumes would be and we would similarly submit that the price is not sufficiently apparent on the record and sufficiently demonstrated by any competent record evidence for this court to have found that there was a genuine issue of fact with respect to a promise. Let's, of course, under your view of the case, we never have to read to the jury question, but suppose we think this case has to go back, how would Lanza have been detrimentally prejudiced if it was required to appear before a jury? Your Honor, similar to the McJunkins opinion that we cited in our materials, Lanza proceeded in this case to develop a strategy with respect to its witnesses and with respect to its strategy based on its understanding that it was going to present this case to a bench trial. And through the four separate orders and notices that the court provided to the parties confirming that, Lanza made selections as to who it would present as a 30B6 witness, who it would present as its primary witness, largely because the company that was involved in the negotiations with FutureFuel is no longer a part of the Lanza organization. One of the primary witnesses, Dr. Lugin, is no longer with the organization. Okay, it would have been detrimental to that but would all of these have been insurmountable problems? Well, Your Honor, at the time the counsel made her motion for a jury trial, discovery was complete. Summary judgment motions were four days from being submitted to the court and we would attest that to the extent that this court would reverse and send the case back down for a jury trial, which we concede, which we argue it would not need to do in this case, but if it were to do that, FutureFuel would already have the benefit of all of the testimony from the company that had been provided from a 30B6 witness who may not have been the witness that we would have presented had we understood we were going to proceed to a jury trial. We may have tracked down Dr. Lugin from Switzerland and seen if we could obtain his testimony, which is not an easy issue given the Swiss privacy laws. We would have made certain decisions, perhaps, to recall other witnesses who were no longer associated with the company. And these were decisions that we made at the outset of this case and continuing through the discovery of this case, reevaluating and again considering that this would be presented to the bench. Similarly, we had not at that point had an opportunity to consider whether to move, make a motion to move this case out of Batesville, Arkansas, understanding that FutureFuel is the second largest employer in that region. And so we believe that the case was developed and discovery was completed. The parties were in the midst of their final pre-trial preparation. The issue actually arose during court-ordered discussions with counsel to set an expert witness disclosure schedule that the parties would agree to. Those discussions shut down because counsel wouldn't have  So, Ms. Lugin, what is your company's position with respect to the confidentiality of the records? Very easy, Your Honor. We take no, we have no position. We leave it to this court's ruling. What we do ask is that the court recognize that as it did in the 168th and Dodge versus Ray Reviews case, if this court affirms the decision of the district court, we affirm a method of proceeding for sophisticated commercial parties that allows them to memorialize a plan to move forward without being bound until they had completed what were significant terms for a long-term agreement. The parties in this case intended to, agreed to, and promised to do nothing more than negotiate towards that final agreement. And they did just that. They just very quickly and succinctly, if you can, what's your view, your position as to why the 1,000 metric tons for 2009 never changed hands? Because as Dr. Fry conceded in his testimony and his deposition, the parties' negotiations became fallow and they were never resurrected. The parties never got to the point where they reached a final agreement and were bound. And so Future Fuel had no obligation at that point to produce and to sell it to Lonza. Did either side make a demand one way or the other? In July of 2009, Your Honor, Lonza made a request to purchase DEM and Future Fuel sold DEM at a price significantly higher than what appeared in the letter of intent, thereby conceding without question that there was no contract. May it please the Court, in my final couple of minutes. What about that, Counsel, doesn't that, if that's true, what we just heard, that some of this material, the substance was actually sold in 2009 at a price that's different from what's mentioned in this writing? Doesn't that go a long way towards eliminating the posture of this document as a binding contract? No, Your Honor, because Lonza had already breached at that time. We had already indicated to Lonza, you need to go forward with your promise to purchase, and they had already indicated to us that they would not. Therefore, we sold to them at a spot purchase price because they had not gone forward with their contract. The point that I think is important. Counsel didn't mention that, but you say that prior to this, what was referred to a moment ago, there was a demand by your client that the contract be observed and that a purchase towards this 1,000 metric tons actually be made. Yes, Your Honor, we referred to the letter of intent and told them that created an obligation to make a purchase.  Were we going to look at a deposition for that, an affidavit, or where would we go? A letter from my client was introduced and discussed in their depositions. I'm sorry, I don't, Your Honor, I don't have that, but it was introduced. Or a deposition in which it was mentioned? My client's deposition, it would have been mentioned in Dr. Frye's deposition, it would have been mentioned in Mr. Dolan's deposition on behalf of Lonza, but yes, it was a letter where we said, you must comply with the letter of intent, and they said they wouldn't. The thing I think is important with regard to the letter of intent, it was a contract. The discussions back and forth on the supply agreement, that wasn't to enter into a contract, that was to perform or complete the contract that had been entered into. Lonza had an obligation to purchase 1,000 metric tons. They had an obligation to enter into a contract. This didn't fall apart because of the terms of the supply agreement. Those terms had to do with things like when the delivery would take place, who would indemnify whom, and also with regard to the price. There are cases that say as long as the essential terms are set forth in the agreement, that other terms, if it shows how those are to be decided, can be. We would say that there is a contract, number one, or at the very least a promise that we relied on, and that Lonza knew that we were relying on that promise or we wouldn't have gone forward. This wasn't just us entering into a hope that something was going to happen. They knew that we would only undertake this step if they promised to make that commitment, and they did promise to make that commitment. The letter of intent otherwise would be meaningless. It was not just for us to go forward and talk about maybe whether we would do something or not. We let them know over and over in e-mails, and they knew it, that we were not willing to go forward unless we had a commitment from them. A commitment, a promise, a contract, and we did have a contract, and the parties acted on that contract. We made a demand on them to fulfill it, and they failed to do so. On the final issue of the jury trial, one thing I will mention is that as late as November of 2011 in the protective order that was entered, it makes mention of a jury trial. This was a mistake that the court made, that Lonza made, and that Future Fuel made. I see. Thank you. The case is submitted. We thank both sides for the arguments and the briefs. The case is submitted. We will take it under consideration.